# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2480
_____

United States of America,

*Plaintiff - Appellee,*

v.

Alexis Salgado,

*Defendant - Appellant.*
_____

Appeal from United States District Court
for the District of South Dakota - Pierre
_____

Submitted: March 14, 2014
Filed: July 31, 2014
_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Alexis Salgado entered a conditional guilty plea to distributing and possessing with intent to distribute a controlled substance, and to aiding and abetting that offense. Salgado moved to suppress physical evidence that was seized from the vehicle he was driving on the morning of his arrest, and he sought field-performance records of the drug-detection dog that alerted and indicated at two potential locations

of drugs in the vehicle. The district court[1] denied the motion to suppress the physical evidence and refused to grant Salgado access to the dog's field-performance records. We affirm.

## I.

At approximately 1:40 a.m. on May 20, 2012, Trooper Justin Schmiedt observed a broken-down vehicle on the side of the road one to two miles outside Winner, South Dakota. Schmiedt parked behind the vehicle and exited his squad car to assist the motorists. As he approached, Salgado and another man immediately walked from the front of the disabled car to Schmiedt and told him several times that they needed no help. Schmiedt found this response to his presence unusual based on his experience aiding motorists. When he shined his flashlight on the back seat of the vehicle, Schmiedt noticed a third person and a jacket embroidered with a large marijuana leaf; the jacket was partially covering what appeared to be electronic devices.

Schmiedt asked the men who had been driving the vehicle, and Salgado said that he had been. Schmiedt asked Salgado for his driver's license, and Salgado responded that he did not have one. Schmiedt brought Salgado to the squad car to process him for operating a motor vehicle without a license. Schmiedt provided a dispatcher with the name and date of birth that Salgado gave him, but no records in the state databases of Minnesota and South Dakota matched the information. Schmiedt asked Salgado several questions about himself, his associates, and their points of travel. Salgado said they were traveling from Sioux Falls to Mission, South

---

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota, adopting the Reports and Recommendations of the Honorable Mark A. Moreno, United States Magistrate Judge for the District of South Dakota.

Dakota, and he was unable to identify either of the two passengers, except for knowing one as "Homie."

At that point, at approximately 1:46 a.m., Schmiedt asked the dispatcher how far away the nearest on-duty drug-detection dog was, but he was told that none was nearby. Schmiedt testified in the suppression hearing that Salgado's general behavior in the interaction and his evasive answers to routine questions piqued Schmiedt's suspicion "that there was some type of criminal activity going on." He continued attempting to identify Salgado, and he asked Salgado several times for consent to search the vehicle for illegal drugs and other contraband, but Salgado refused to consent and insisted that there were no drugs in the vehicle. After Salgado refused, at approximately 1:55 a.m., Schmiedt called off-duty Trooper Brian Biehl, who was at his home approximately forty-five miles away, and asked him to bring a drug-detection dog to the scene. Schmiedt also called a deputy for assistance and continued his efforts to obtain information about Salgado and his passengers.

Biehl arrived at approximately 2:45 a.m. with his drug-detection dog. The dog alerted at one location on the vehicle and indicated at another, and the officers conducted a search. As Biehl explained in the suppression hearing, an "alert" is a change in the dog's breathing pattern, while an "indication" is a more concrete signal that the dog has detected a particular odor. The officers recovered a cigarette box containing methamphetamine, a hat band containing trace amounts of marijuana, and a glass pipe. Schmiedt arrested Salgado and the two passengers.

A grand jury charged Salgado with distributing and possessing with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and with aiding and abetting that offense, in violation of 18 U.S.C. § 2. Salgado moved to suppress the evidence seized after the dog sniff. He argued that once he declined Schmiedt's offer of assistance, Schmiedt's investigation became an unreasonable seizure under the Fourth Amendment. Alternatively, he challenged the existence of

-3-

probable cause for the vehicle search based on the reliability of the drug-detection dog's alert and indication, and he moved the court to require the government to disclose relevant documents, including records of the dog's performance in the field.

A magistrate judge recommended that the district court deny the motion to suppress physical evidence. The magistrate judge received the dog's field-performance records from the government, over its objection, but did not disclose them to Salgado. The district court adopted the reports and recommendations of the magistrate judge, but filed a separate opinion and order addressing Salgado's objections to the reports.

With respect to the physical evidence at issue in this appeal, the district court reasoned that Schmiedt's initial encounter with Salgado was a consensual motorist assist. When Salgado failed to provide a driver's license, the court ruled, Schmiedt had reasonable suspicion to justify further detention based on Salgado's unusual refusal of assistance, the marijuana leaf–embroidered jacket, and the fact that the name and date of birth Salgado provided did not match the state databases. Based on that reasonable suspicion, the district court concluded, a dog sniff was permissible, and Schmiedt did not unreasonably prolong the detention while Biehl brought the dog to the scene.

Regarding Salgado's challenge to the dog's reliability, the district court held that the government had provided sufficient evidence to establish probable cause based on the dog's alert and indication, and that Salgado was not entitled to the dog's field-performance records. Salgado then entered a conditional guilty plea, reserving the right to bring this appeal of the denial of his motion to suppress and his motion for the drug-detection dog's records. We review the district court's findings of fact for clear error and its legal conclusions *de novo*. *United States v. Rodriguez*, 711 F.3d 928, 934 (8th Cir. 2013).

II.

We address first Salgado's argument that Schmiedt violated his Fourth Amendment rights. As Salgado concedes, Schmiedt's initial offer of assistance did not implicate the Fourth Amendment. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotation and citation omitted).

Schmiedt pulled over behind Salgado's broken-down car and approached to offer his assistance. According to Schmiedt, he attempted to identify the driver so that he could relay the information to dispatch and establish a record that an officer had made contact with the stranded motorists. Police officers reasonably may engage in a community-caretaking function with respect to motor vehicles and traffic, *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), and Schmiedt's exercise of that function in approaching a disabled vehicle did not amount to a seizure requiring probable cause or reasonable suspicion of criminal activity. *See United States v. Smith*, 162 F.3d 1226, 1226 (8th Cir. 1998) (per curiam). We reject Salgado's contention that a reasonable person would not feel free to go about his business merely because Schmiedt did not leave the scene or return to his squad car once Salgado and his associate told him that they did not want his help. Salgado and his passengers were parked on the side of a public thoroughfare with a disabled vehicle. A reasonable person in Salgado's position would have understood that a state trooper had legitimate reasons to monitor the situation without seizing the motorist.

Once Salgado identified himself as the driver and admitted that he did not have a driver's license, Schmiedt had probable cause to issue Salgado a citation for a traffic violation. Schmiedt was thus entitled to detain Salgado for the purposes of writing him a citation, confirming his identity, and checking his criminal history.

*United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004). After Schmiedt brought Salgado to the squad car, he asked the names of the passengers, where the men were going, where they had come from, and other general questions. These initial questions, even if they were not directly related to Salgado's traffic violation, only minimally prolonged the encounter and did not effect an unreasonable seizure. *See United States v. Olivera-Mendez*, 484 F.3d 505, 510-11 (8th Cir. 2007); *United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc).

By 1:46 a.m., only roughly six minutes after first encountering Salgado, Schmiedt inquired as to the availability of a drug-detection dog. Based on the totality of the circumstances, we conclude that Schmiedt then had reasonable suspicion that criminal activity was afoot.

When Schmiedt first arrived at the scene, Salgado and his companion immediately and repeatedly told him that they did not need his help. Schmiedt did not act based merely on a refusal to consent to a search. *Cf. United States v. Green*, 52 F.3d 194, 200 (8th Cir. 1995). He reasonably found it suspicious, given his experience, for potentially stranded motorists so adamantly and immediately to express that his presence and assistance were unwelcome. Schmiedt also observed, as he approached the vehicle, the jacket embroidered with a large marijuana leaf in the back seat, and reasonably associated it with potential drug activity.

At the squad car, Schmiedt was unable to match the name and date of birth that Salgado provided to the South Dakota and Minnesota databases, and provision of false identification is an indicator of criminal activity. *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). Salgado argues that he in fact provided the correct name and that Schmiedt mistook "A-L-E-X" for "A-L-E-S" due to Salgado's accent. But even if Salgado's explanation is correct, it does not negate the fact that Schmiedt—at the time of the encounter—reasonably believed that Salgado had provided a false identity.

-6-

Finally, when Schmiedt asked Salgado about his passengers, Salgado was unable to identify them and knew one of them only as "Homie." This unfamiliarity with fellow travelers reasonably enhanced the trooper's suspicion that the threesome were not on an innocent journey. All of these facts, taken together, provided Schmiedt reasonable, articulable suspicion sufficient to justify an investigatory stop, including a dog sniff. Salgado's alternative argument that Schmiedt impermissibly extended Salgado's detention for the traffic violation until the dog's arrival without reasonable suspicion is thus founded on a faulty premise.

Once this reasonable suspicion was developed, Schmiedt did not effect an unreasonable seizure by detaining Salgado until the time that Biehl arrived with the drug-detection dog. Schmiedt suspected criminal activity by roughly 1:46 a.m., when he first inquired as to the availability of a dog. After learning that no dog was nearby, and after attempting to obtain Salgado's consent to a search, Schmiedt called Biehl at approximately 1:55 a.m. Biehl, who lived roughly forty-five miles from Salgado's location, arrived with the drug-detection dog at approximately 2:45 a.m. Because Salgado's hour-long detention before the dog sniff was attributable to the remote location, not to any lack of diligence or unnecessary delay by law enforcement, we conclude that it was reasonable under the circumstances of this case. *See United States v. Maltais*, 403 F.3d 550, 556-58 (8th Cir. 2005).

III.

Salgado also argues that the district court violated his rights under the Fifth and Sixth Amendments by considering records of the drug-detection dog's field performance *in camera* without disclosing the records to him. The court's reliance on those records without giving him an opportunity to review and contest them, he argues, deprived him of his rights to due process and to a public suppression hearing.

A trial court may conduct an *in camera* review of disputed materials in order to determine whether they are subject to disclosure. For example, under Federal Rule of Criminal Procedure 16, a district court may appropriately conduct *in camera*, *ex parte* review of discovery materials to determine whether they must be disclosed to the defense. Fed. R. Crim. P. 16(d)(1).

The magistrate judge suggested in the suppression hearing that he would consider the drug-detection dog's field-performance records *in camera* to determine whether they should be disclosed to Salgado. But the magistrate judge then appeared to go beyond this screening function to consider the records in the decisionmaking process. The magistrate judge stated that he would receive the field-performance records and examine them *in camera* along with evidence of the dog's certification (which had been disclosed to Salgado) for the purpose of determining the reliability of the dog's alert and indication on Salgado's vehicle. The magistrate judge's report and recommendation to the district court on that issue referred to the dog's performance in the field and gave the impression that the judge had relied upon the field-performance records in finding the dog's alert and indication reliable.

The district court, in rejecting Salgado's argument that he should have access to the field-performance records, relied on *Florida v. Harris*, 133 S. Ct. 1050 (2013). In that case, the Supreme Court concluded that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," *id.* at 1057, and expressed skepticism about the evidentiary value of field-performance records. *See id.* at 1056-57. The district court noted that the Court in *Harris*, in enumerating possible ways to challenge a dog's reliability, did not suggest that a defendant should be given access to the dog's field-performance records. *See id.* at 1057-58. In finding the dog's alert and indication reliable in this case, however, the district court observed that the dog's "field records demonstrate a high level of precision."

We conclude that evidence of the dog's training and certification was sufficient to establish the dog's reliability and thereby to demonstrate probable cause for the vehicle search. *See id.* at 1057. As with the defendant in *Harris*, moreover, Salgado was able to cross-examine the dog's handler about the dog's performance in the field. *See id.* at 1057-58. We see no abuse of discretion in the district court's denying Salgado access to minimally probative field-performance records for the purpose of cross-examining Biehl.

As for Salgado's argument that the district court impermissibly relied on the field-performance records that were submitted for *in camera* review at the court's direction, we conclude that any improper consideration of the records was harmless error. *See* Fed. R. Crim. P. 52(a). Before the district court discussed the field-performance records in its order, the court already had concluded that evidence of the drug-detection dog's training and certification sufficed to establish the dog's reliability. It is clear that the result of the hearing would have been the same with or without consideration of the dog's record in the field.

*       *       *

The judgment of the district court is affirmed.

_____